**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 1 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ELKE DUNLAP,

    Plaintiff-Appellant,

v.

STATE OF KANSAS, DEPARTMENT
OF HEALTH AND ENVIRONMENT,

    Defendant-Appellee.

No. 02-3331
(D.C. No. 00-CV-4185-RDR)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ, HOLLOWAY** and **McKAY**, Circuit Judges.

    Plaintiff-appellant Elke Dunlap sued her employer, the State of Kansas Department

of Health and Environment, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e-2000e(16), alleging discrimination based on gender and national origin and unlawful

retaliation. The district judge granted the defendant's motion for summary judgment, and

Dunlap now appeals.

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

## I

The facts, as viewed through the prism of the defendant's summary judgment motion, are set out in detail in the district court's thorough opinion, 211 F. Supp. 2d 1334 (D. Kan. 2002), and we will present here only a summary. Plaintiff was born in 1944 in Germany and lived there until she was 19 years old. She then married an American and moved to this country in 1963. She still speaks with an accent. She is a naturalized citizen of the United States. She has been employed by the Kansas Department of Health and Environment since 1992. In October 1997, she began working at a location called Forbes Field in the Office of Information Systems.

In the spring of 1998, she was placed under the supervision of Phil Breedlove, and most of her allegations come from that time. Plaintiff testified that she often overheard Breedlove make fun of female employees who spoke with accents. Breedlove would gather with other men after teaching a computer class and use a Spanish accent to mock questions that women had asked during the class. This would often occur close to plaintiff's work station where she could hear the conversation.

Plaintiff said that after trying to ignore this for awhile, she asked Breedlove to stop it. When that failed to stop the behavior, she approached Breedlove's supervisor, Pam Tierce. However, nothing was done and the practice continued until plaintiff's desk was moved away from where this was going on.

It is not clear how frequently this had occurred. Plaintiff testified that it would occur

at least weekly and sometimes three times in a single day, depending on the number of classes Breedlove had and the number of foreign born speakers in the classes. Breedlove never attempted to mimic a German accent, nor did he make any remarks about persons of German ancestry. Plaintiff did testify in deposition, however, that Breedlove would sometimes pretend not to understand her accent in order to force her to repeat words that he knew were difficult for her to pronounce.

In February 1999 plaintiff became involved in a "cowboy hat incident." A former high level employee who habitually wore a cowboy hat had retired. One day soon afterward, Tierce and Breedlove saw a cowboy hat at plaintiff's work station with a note on it saying "RIP." They interpreted this as a celebratory note. The suggested inference was that the retired supervisor was not popular and other supervisors knew it.

Plaintiff was not at work that day (although the district court indicated that the hat with the note had been at her station for some days by this time) and denied knowing anything about the hat and note. Tierce immediately called and reported the "incident" to a personnel officer. Plaintiff received a letter, which she now contends was a reprimand but which defendant characterized as a letter of concern, from the Secretary of the Department. The letter said that the display was "disrespectful" and had caused "undue disruption to the workplace." The letter was not placed in plaintiff's personnel file.

Plaintiff contended that Breedlove knew that the hat did not belong to her and knew that she was not at work that day. Therefore, she alleged, he had lied to implicate her in the

incident. She also contended that she was disproportionately punished over it. The owner of the cowboy hat, a male, and two American -born female receptionists, who in April 1999 had cowboy hats with RIP on them, were not reprimanded at all, Dunlap maintains.

On June 22, 1999, plaintiff Dunlap was delayed by traffic and was late returning from lunch. She put a leave slip in Breedlove's box as a result. She said that he became infuriated about it, for unexplained reasons. However, he approved the leave, which was at his discretion.

Plaintiff also alleged two instances of disparate treatment related to leave or "rearranged time." First, plaintiff testified that her request for leave to care for her seriously ill husband was scrutinized more closely than the request of a male employee whose pet ferret became mortally ill. Plaintiff testified that an American-born male was given two days off either to care for his sick pet ferret or to grieve over the animal's passing, without any question. In contrast, when plaintiff's husband was seriously ill and she requested leave to care for him, she was questioned about the need for it.

The second incident occurred after Tierce became plaintiff's direct supervisor instead of Breedlove, and this incident involves "rearranged time." Although we have not been given a definition of this term, from the context it clearly seems to mean a flexibility in an employee's hours provided for the employee's convenience. Thus, for example, an employee who was an hour late for work because of a dental appointment could, we infer, make up the time by staying one hour later than usual, avoiding the necessity of using accumulated leave

for such a minor contingency. One day when Dunlap was late to work because of traffic, she requested "rearranged time" but this was refused by Tierce. In contrast, males "got away with anything they wanted to," according to plaintiff's testimony.

Plaintiff filed her first administrative complaint with the Kansas Human Rights Commission on March 22, 1999. She complained about the mocking of females with accents and that she had been harassed and discriminated against based on her gender and ancestry with regard to the cowboy hat incident. Plaintiff contended in the district court that Breedlove began retaliatory conduct after she filed the charge. She cited the leave slip incident and also said that Breedlove began taking duties away from her. She alleged that he drafted a job description for her that appeared designed to demote her from Office Assistant IV to Office Assistant II. Breedlove made about five requests to have her removed from his supervision.

Plaintiff filed an amended administrative charge on August 19, 1999, adding two instances of allegedly discriminatory treatment based on gender and ancestry. The first of these two alleged discriminatory acts is not discussed on appeal. The second was the June 22nd incident described *supra*.

Plaintiff allegedly suffered severe mental distress with accompanying physical symptoms. These include anxiety attacks, depressions, headaches, crying spells, vomiting, shaking and other symptoms. She could not pinpoint the onset of her ailments but said that it got "out of hand" after she received the letter of reprimand about the cowboy hat.

## II

Ms. Dunlap first argues that the district court erred in determining that defendant was entitled to judgment as a matter of law on her claim of a hostile work environment. In evaluating a discrimination claim based on an allegedly hostile work environment, a court must inquire whether "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult, . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . .'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal brackets and quotation marks omitted). Further, we also examine whether the harassment was based on a protected characteristic. Thus we inquire whether the alleged harassment was based on Ms. Dunlap's gender or national origin. *See Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) ("General harassment if not racial or sexual is not actionable.").

The district judge concluded that the incidents where Breedlove would pretend not to understand Dunlap's accent were the only ones that were based on her national origin or her gender. We agree with the district court that these incidents were insufficient to show an atmosphere of severe or pervasive bias.

Incidents which the judge found not probative of forbidden bias included the handling of the cowboy hat incident, the leave slip incident, and Breedlove's reduction of plaintiff's duties. These, the judge found, and we agree, do not appear related to Ms. Dunlap's gender or national origin. (Although we return to some of these incidents *infra* in discussing

plaintiff's claim of disparate treatment.) The district judge also found that the repeated instances of Breedlove mocking other females with Spanish accents were not gender based. This observation is dubious.

Nevertheless, we agree with the district court that plaintiff's evidence fell short of showing that the offensive conduct was severe or pervasive enough to constitute a hostile environment. We note that in spite of the observation that most of the incidents cited by plaintiff to support her claim were not targeted at her because of her ancestry or gender, the district judge did not ignore the evidence but considered it carefully. In particular, the judge took another look at the evidence of Breedlove's mocking of his female students who had Spanish accents. The judge did not reject this evidence out of hand but observed that "in an appropriate case mimicking of accents could serve as indirect evidence of discrimination . . . ." 211 F. Supp. 2d at 1341. But in this case, the judge went on, because the accents being mocked were not similar to plaintiff's, *and* because that conduct was not aimed at her (but merely overheard by her), "the causal link is simply too weak to give rise to an inference that plaintiff's German ancestry or gender was somehow being targeted." *Id.* We agree with this analysis.

In sum, plaintiff's evidence was insufficient to show that she was subjected to a work environment of severe or pervasive hostility, and some of the meager evidence she proffered was of questionable relevance because it did not show a connection to her gender or national origin.

## III

On plaintiff's disparate treatment claim, the district judge acknowledged that our circuit has a liberal standard as to what constitutes an adverse employment action, but concluded that plaintiff failed to meet even this low threshold.[1] The letter of concern or of reprimand was not enough, the judge found. On that point, the judge cited *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001), which held that a reprimand alone is not enough but must be accompanied by a demotion or some other job action. The judge also noted that a similar conclusion had been reached in *Robleado v. Deffenbaugh Indus., Inc.*, 136 F. Supp. 2d 1179 (D. Kan. 2001), *aff'd*, 33 Fed. Appx. 480 (10th Cir. 2002). He found these authorities persuasive and held that because there were no other consequences and the letter was not put in plaintiff's personnel file, the letter did not constitute adverse employment action.

The judge found that the allegations of disparate treatment based on denial of plaintiff's requests for leave time and rearranged time failed for the same reason. Being questioned about leave requests and having one request for rearranged time denied are too

[1]To establish a prima facie case of disparate treatment in violation of Title VII in the circumstances of this case, Ms. Dunlap was required to show that she is a member of a protected class by virtue of being female and of German national origin; that she was subjected to an adverse employment action; and that employees who were not members of the protected class or classes were treated more favorably. *See, e.g., Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1380 (10th Cir. 1994). The elements of the prima facie case are flexible, depending on the circumstances of the case. *See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192-95 & nn.6-7 (10th Cir. 2000).

trivial, he found, noting that other courts have held that transfer and scheduling decisions of more significance than these were insufficient. He cited among other cases *Amro v. Boeing Co.*, 232 F.3d 790, 797 (10th Cir. 2000).

As the district judge noted, we liberally define the phrase "adverse employment action." *See, e.g., Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004). As we have applied the term, adverse employment actions "are not simply limited to monetary losses in the form of wages or benefits. Instead, we take a case-by-case approach, examining the unique factors relevant to the situation at hand." *Id.* (quoting *Sanchez v. Denver Public Schools,*, 164 F.3d 527, 532 (10th Cir. 1998)). However, "a mere inconvenience or an alteration of job responsibilities," does not satisfy even our liberal standard. *Sanchez*, 164 F.3d at 532.

We think it quite clear that being questioned about a request for leave is, at least in the circumstances of this case, "a mere inconvenience" that does not constitute an adverse employment action. The same is true for the plaintiff having had to use a trivial amount of leave time on the one occasion that she was denied the convenience of "rearranged time."

The letter of concern is not quite so easily dismissed as a trivial inconvenience. But with our focus on the specifics of this case, and particularly in view of two circumstances – that the letter was not made a part of plaintiff's personnel file and that no allegation (much less showing) is made of adverse consequences following from the incident – we agree with the district judge that this did not constitute an adverse employment action.

**IV**

The final issue on appeal is whether the district court erred in concluding that plaintiff's retaliation claim was barred by her failure to exhaust administrative remedies.[2] We affirm the district court's ruling although we reach our conclusion on different reasoning, basing our holding on *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). As we have previously noted, that case "has effected fundamental changes to the doctrine allowing administratively unexhausted claims in Title VII actions." *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003). Plaintiff's argument in this case is based on our pre-*Morgan* case law which recognized a "narrow exception" to the exhaustion requirement – permitting a claim for incidents not listed in the original administrative charge to be included in the lawsuit if the incidents are "like or reasonably related to the allegations" of the administrative charge. *See Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 799 (10th Cir. 1997). We had also held that "an act committed by an employer in retaliation for filing of an EEOC complaint is reasonably related to that complaint, obviating the need for a second EEOC complaint." *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir. 1994).

---

[2]As noted by the district court, the alleged retaliatory conduct consisted of the incident mentioned *supra* in which Breedlove became angered about plaintiff's submission of a leave slip; Breedlove's reduction of plaintiff's responsibilities; Breedlove's attempt to "silently demote" plaintiff by preparation of a job description reflecting reduced duties; and Breedlove's requests to have plaintiff placed under another supervisor. 211 F. Supp. 2d at 1339. We express no opinion on the merits of these contentions.

As we noted in *Martinez*:  *"Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." 347 F.3d at 1210.[3]

Plaintiff's argument is simply untenable in the wake of *Morgan*.  The incidents which she alleges to have been retaliatory conduct by the employer are discrete incidents of allegedly unlawful employment practices and subject to the requirement of administrative exhaustion, unrelieved by our prior doctrine which excused the exhaustion requirement for acts reasonably related to the acts included in the administrative charge.  The judgment is

AFFIRMED.

ENTERED FOR THE COURT

William J. Holloway, Jr.
Circuit Judge

---

[3]We note that the district judge did not have the benefit of *Martinez* when he issued his opinion.